Mr. Elias? Mr. Chief Justice, and may it please the Court, the District Court created out of whole cloth a new legal standard that permitted Virginia to apply a one-size-fits-all, 55 percent racial floor to all 12 of its predominantly black districts. Virginia applied this 55 percent rule to move voters in and move voters out of districts on the basis of race, regardless of the differences in voting patterns, geography, demographics, or the actual interests of black voters in each of those districts. This actual conflict test, which the D.C. – I'm sorry, which the District Court invented for predominance, has no basis in this Court's jurisprudence. Instead, it confers a sort of judicial immunity to visually appealing districts that nevertheless were drawn with the predominant purpose of placing voters within and without based solely on the color of their skin. I'm not quite sure I understand how you assess predominance, which I think is the challenge here, and to take a hypothetical. Let's say you're trying to select people for a particular board or something, and you say they have to come from a city with more than 500,000 people, absolutely. And then you say, and they have to come from such a city in California. It can't be anywhere else. Now, which is the predominant factor, the 500,000 or California? Well, in this case, under the jurisprudence of Alabama of the State of California of California. I don't really care. I'm not talking about this case. It's a hypothetical. I think that you can set aside the population center, and you would look at the State of California as the predominant factor, because it is the criteria to which all others  And in this case the predominant factor is the 500,000. Well, how do you know that? I mean, it seems to me that the 500,000 is the criteria which to which all others might yield. In that hypothetical, each of them might be an unyielding criteria. In this case, there was only one. Well, no, I know. That's why I'm looking at why this is called a hypothetical, because it's not about the particular case. But obviously what I'm trying to highlight is predominant means one that dominates over all the others. And it's easy to imagine situations where you cannot say that one dominates over all the others. So what do you do in a situation like that? I think I now understand your question. In that case, neither criteria would predominate, because in fact neither one controls the other. And in that case, we would not have met our burden of predominance, and as a result we would we wouldn't get to the second step of strict scrutiny. Where you have one criteria, though, then you can fairly say there was predominance, because Well, if you're still you're trying to figure out which which predominates, and I think this is where the inquiry or the test that you challenge comes from. One way to tell which is the predominant is to see if they conflict. And if they conflict, then how do you resolve it? And whatever trumps the other, that's the predominant one. That, Your Honor, that is one way that evidence is adduced to determine predominance. But it is not the only way. If, in fact, to use your hypothetical, the legislature of California, let's assume that they're the one setting these criteria, says our predominant factor, the dominant and controlling factor, is that it has to come from the State of California, the fact that it may also come from a the members may also come from a city with more than 500,000 members doesn't mean that the first criteria didn't predominate. We know it because the legislature told us this is the dominant and controlling factor, this is the dominant criteria. And that's what happened in this case. Alito, what if the legislature says, look, we want to follow all the traditional districting, apply all the traditional districting factors. However, one thing that we absolutely do not want is to be held to a violated section 5 or section 2 of the Voting Rights Act. So we have these 12 majority African-American districts, and we don't want to do anything to them that results in liability under the Voting Rights Act. Is that predominance? It is predominance if race was the controlling factor in that could not yield in the drawing of the districts. Now, it may very well be that when the Court then completes its inquiry, there would be a strong basis in evidence that drawing the districts that way was to comply with a good-faith understanding of the Voting Rights Act, and then the State wins. In this case, though, what the State did is it started with an evidence. Alito, I didn't really understand the answer to the question. If the Court says, if the State says, the one thing we absolutely do not want is to be found to violate the Voting Rights Act, that is not predominance? That is not necessarily predominance in your view? That is not necessarily predominance. It is when that is taught, because there are any number of ways to comply with the Voting Rights Act that allow this to be the dominant and controlling factor. For example, you have any number of districts, I would hazard to guess, and it is only a guess, a majority of the districts in this country that are drawn by legislatures, that are majority-minority, where they start with traditional redistricting criteria, and the district is over 50 percent or over whatever the applicable threshold is, and they never need to trump the traditional redistricting criteria with race. In this instance, they trumped, and I use that word. Breyer, what is your evidence of that? I mean, look, which I'm sure you've read, in the Alabama Legislative Black Caucus, which I had hoped would end these cases in this Court, which it certainly doesn't seem to have done. All right. But if you make the comparison, it isn't enough, I don't think, for you to say, that they just saw some traditional factors and they didn't take into account other evidence that they were using race predominantly. Well, if you look at the other evidence on page 1271, you know, the West thing, it was pretty strong evidence. They added 15,785 new voters, and of those, precisely 12 were white. All right? Now, is there any room when you looked at their use of the factors, the traditional factors, they were pretty irrelevant. Right. Now, it makes a point of that in the opinion, and that's meant to guide the district judges. And so what's the equivalent here? What's the equivalent if, assuming he didn't say exactly the right words, no one can say exactly the right words? What's his mistake? His mistake is setting an arbitrary threshold at 55 percent. Now, what is the evidence that you say would show that, in fact, they did use race? What's your strongest one or two pieces of evidence? You saw the 15,785. That's pretty strong. I think if you look at District 71, okay, what you find is this is an inner city district at the core of Richmond. And this is a district that had a 46.3 percent BVAP. And because of the 55 percent rule that had been set out, and there's really no dispute, the district court agrees that it that that was a rule that guided the drawing of districts, all of the districts. As a result of that rule, we what you see is a racial gerrymander. You see that that district went from 46.3 to 55.3 by essentially raiding every other district around it, essentially the suburbs and the exurbs, raiding those districts and bringing black voters in, notwithstanding the fact that it was a classic crossover district. It was a district in which essentially white liberals who had moved to the city were voting in harmony. Breyer, what was the number, roughly, of the new people in the district, how many are black, how many white? Of the people who were moved out of the district, how many were black, how many were white, approximately? They they the I don't have the precise number that were moved in and out, but there were a significant number in the in the many thousands of voters who were moved in and many thousands who were moved out. The significant number matters because, after all, the the that was the key factor in Swann. Right. And I think. How do I find that? I think it's on it's in the Joint Appendix on 669 has the has the movements. I just as I stand here, I don't know them, but it's for all 12 districts. But it is a significant number. It's not it's not two or ten or even a hundred. It's several thousand in a district that is only I found what I wanted to know. I just want to know where to look. Mr. Rice, could I make sure I understand what's your view of let's let's the policy here says 55 percent and it says that across the board as to each of these 12 districts and it says effectively, this is the most important criteria in the sense that it will trump other things. All right. So but as I understand your argument, you're not resting your case on that fact alone. Is that correct? That is correct. And why is that? When would such when would such a policy not have the requisite impact on a voting district? Right. Justice Kagan, I think this gets actually to Justice Breyer's exact point. If if you had a district where it had no impact, it actually didn't cause voters to be moved in significant numbers. Then then we agree with with the Solicitor General's office and this court in Alabama that if a significant number of voters are not moved as a result of that racial threshold, then then strict scrutiny is not triggered. So we really are looking to what Justice Breyer suggested, which is we're we're looking to the movement of voters in and out of a particular district. Yes. And I don't think that that is at at in dispute. We will hear from my colleague and maybe I'll be surprised, but I don't think that's the dispute. I think that the issue here is the legal error that was that was committed by the district court in saying that if we find a district that looks like it abided by traditional district criteria, that's the end of the inquiry. That's the end of the inquiry. Even if we can see that there were, you know, essentially all the African-Americans were moved in and all the the the whites were moved out. And even if it was done by an avowed for an avowedly racial reason, under the under the trial courts test, a a the the legislature of Virginia could say we want to corral all of the African-Americans we can because we think they all vote alike and we don't want them infecting the neighboring districts. And so we want to get 70 percent of them into a district. And if lo and behold, they then draw a circle, right, a visually the most compact district you can, under Judge Payne's opinion below, we don't ask the question about race. We never get to the evidence of the avowedly racial. Robertson, So you're saying, yeah, so you're saying you do not need a conflict between traditional criteria and race. Gershengorn Correct. Robertson, But do you agree with the Solicitor General that says, who says nonetheless that, quoting on page 8 of their brief, In the vast majority of cases, a conflict may be necessary evidence to establish racial predominance? Gershengorn I think that that overstates it slightly. I'm not sure that I would say in the vast majority of cases. In many cases, you're going to have a correlation. I agree with the Solicitor General. Robertson, Well, even if you're saying not in the vast majority, but in the majority, why is that? Based on your answer to Justice Kagan, why is it that you're almost, almost always a vast majority for the SG or something less than that in your Gershengorn I think the reason is because in the real world, the way in which population distributes, you're going to need to create bizarre districts in many instances, in many parts of the country. You're going to need to have visually unappealing districts in order to conduct what is essentially a Shaw violation. But that's the reason why I point you to Richmond is that Richmond is exactly the instance of a place where that's not going to be necessary, because you do have a crossover district. You have a district where you have white college students and white young professionals moving into an urban, a prior urban center, voting in harmony and reinforcing with the African-American population in that area. So it won't necessarily be visually bizarre, but it is nevertheless the destruction of that crossover district to create a 55 percent for the sake of 55 percent is, is not going to even be a.  Breyer. Breyer, you guys have said this and, I know all of you have, and we haven't said just the use of race is wrong, we've said it has to predominate. Croggan. So you know. And my problem with your argument here, if you want to go on what the district court said there, which you may be right, but this is such a complicated area that it's the easiest thing in the world to go through a district court, lengthy opinion and to find a sentence that's not exactly right. And that's why it seems to me, if we're going to have a ever have districting done back in the legislatures rather than in the courts, you've got to prove your case that not only did what he say was wrong, but it mattered with pretty strong evidence. I agree, Justice Breyer, but I would make two points in response. Number one, this was not a stray sentence. This is the the the in every one of those hundred plus pages, this is the test he applies over and over and over again. You look at the page 111 to 115, and there is a which is a discussion of this this this same Richmond district, and read that analysis, and he says, well, it's visually appealing, therefore we don't need to we don't need to address it, and by the way, district courts, we shouldn't be in the business of assessing credibility between witnesses. We shouldn't be in the business of assessing credibility between between two legislators, because after all, it's visually appealing, and why would we want to do that? This was rife through the opinion, not an isolated statement. It was his holding that where traditional redistricting principles can explain, can explain, then we don't need to actually look at other evidence of what the real motive was. And that error is not something that comes up over and over and over again. That is a unique error in this case. Ginsburg. So are you proposing that we remand, we tell the district court you applied the wrong standard, the right standard is race can predominate even if there is no distortion of the shape of the district? Is that the relief here? I think that that is an appropriate relief, Justice Ginsburg. I think with respect to some of these districts, the Court can simply reverse. I think with respect to that Richmond district, the analysis is the facts are not genuinely in dispute as to what was going on in that district that I think it can be reversed. It's kind of hard to do it just with respect to one, isn't it, because that means, okay, you can't pull these voters in, so you've got to push them back. And now it's in that other district has an issue. I think, Mr. Chief Justice, that's a fair point. I think if you look at the map, what you'll see is we're actually talking about four geographic pockets. There is a Richmond pocket of districts. There is a south side Virginia, which is up against the border of North Carolina. There are two districts. Then there is a lower Hampton Roads and an upper Hampton Roads. And each of those pockets really don't impact the other. So, yes, I agree with you in general it would cause redistricting around the Richmond area. But if you recall, in the Personne-Hubbella case, which this Court heard last term, we dealt with a single district, Bobby Scott's congressional district, which had been racially gerrymandered by the same legislature using the same 55 percent floor. And when they did the redistricting, it only affected the two neighboring districts, I'm sorry, that district and really the district next to it. But I understand the point, and it's a fair one. And in that sense, remand would not be an unreasonable step to take to apply it correctly. Kagan So I can understand your sense of the relative strengths of your arguments. If we did remand, say this is the wrong standard, go apply the right standard, and that was done fairly, where do you think he would have to change his view? Where do you think that there would be a question? And where do you think the same result would probably obtain? So I'd like to say that there would be a new result everywhere. But to answer your question fairly, as I try to always do, I think in the Richmond area there is no question that a fair application of the standard would lead to a new districting in the Richmond area, which are districts 71, 69, and 70, which are districts 71, 69, 70, and 74. I think there is no question that it would lead to a new – it would lead to a different map, a different result. I think in the south side of Virginia, which is two districts, 75 and 63, this was a curious one, because he actually found race did predominate in 75 by splitting Dinwiddie County, Dinwiddie County being a border county of North Carolina, on avowedly racial grounds, but yet did not find race predominated with respect to 63. It's difficult to understand how race could have predominated in the racial division of voters on one side of the line, but not predominate in the racial division of voters on the other.  But as to 75, did he not say that strict scrutiny was met because other legitimate and conventional factors were considered and were present? He did find that. It seems to me that 75 is the strongest case for the district court. I think 75 is the strongest case in the sense that the application of the wrong legal test, he still found that we met our burden of predominance. I think it is a weak finding on the part of the district court in this regard, Your Honor, if you look at what the actual evidence was to meet the strong basis of evidence, because once we found — once predominance was found and strict scrutiny applied, now the burden shifted to the government to explain why they had a strong basis of evidence in doing what they did. Their strong basis of evidence was the following. Number one, that the elected official felt like she would want more — she needed more African Americans in her district. Well, with all due respect to Delegate Tyler, most incumbents feel like they would like more voters in their district who are going to support them, and that's not a — that's not a — that can't be a strong basis of evidence. The second is they alluded to the fact that there were prisons in the district. And this is interesting, because this is, Your Honor, exactly the kind of racial stereotyping that the Voting Rights Act is intended to avoid. There is nothing in the record as to the racial demographics of those prisons. There is nothing to believe that those prisons, included or excluded, raise or lower the overall black voting-age population of the district. They assumed that if a prison had 8,000 people, it had 8,000 black people. And that is — that is exactly the kind of racial stereotyping that cannot form the basis. Alitoso, wasn't there a primary in 2005 in that district where Representative Tyler won over a white candidate by less than 300 votes? Yes, Your Honor, and I'm glad you raised that, because that's the third one, and that is the most important one. Let us take a step back, because it's interesting they say he won by more — she won by more than — by only 300 votes. The districts were drawn in 2000 — in — in — following 2000. In 2001, there was an incumbent who had been there for 30-some-odd years who was the candidate of choice of the African-American community who won. That candidate won again in a landslide in 2003. That candidate then retired, and it was then an open primary. And in that open primary, Delegate Taylor won by 5 percentage points. Now, what's interesting is that 300 votes is 5 percentage points. This was a 6,000-vote primary, five-way. So to say she won by 300 votes and that proves predominance, well, she won in a landslide. She won by 5 percentage points as a non-incumbent in a multiple primary field. I thought she won by only like 1-1⁄2 percentage points in the general. In the general. So what happened next is that the incumbent who had retired, whose son had run against her in the primary, who she had beaten, he then endorses the Republican opponent. So you have this longtime incumbent who endorses the Republican opponent, and she wins by 1.3 percent of the vote in the general. These districts are going to last for a decade, are they not? Correct. And there's no guarantee that the same candidates are going to be running throughout that decade. I agree. So you think they have to take into account this very complicated analysis. Well, it was the person is an incumbent, and therefore is going to have the incumbent's advantage. No, Your Honor, I'm saying the complete opposite. I'm saying that in 2001, 2003, 2007, 2009, this was this performed without a close election. In 2005, the primary was not close. It was a 5-point election. So that leaves us one election, which was the 2005 general, where she won by 1 percent of the vote. Which you're saying essentially is idiosyncratic. It's idiosyncratic one election. But also, this Court has never said that it is a guarantee that they will win. It is, in fact, in Jingles itself, there was a statement that it is not a guarantee that no one election controls. Well, I mean, that gets to an interesting point. To what degree of confidence that it will remain a majority-minority district is necessary to have a strong basis in evidence? I think it has to be. I think it needs to be likely. If there are no other questions, I would like to reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Gornstein. Mr. Chief Justice, and may it please the Court, the district court was right to hold that the use of a racial target is not sufficient to trigger strict scrutiny, but it was wrong to hold that a conflict with traditional redistricting principles is an essential element of a racial gerrymandering claim. On the use of a racial target, the Court's cases have drawn a distinction between the use of race as a factor and the predominant use of race in drawing district lines. And the use of a racial target shows that race was used, but as the Court explained in Alabama, the critical question is whether it was predominantly used. And as to that, evidence that a racial target is used is evidence, but not conclusive proof. To take one example that I think you asked for, if a district starts out 75 percent black voting age population before it's redistricted, and that's based on the general demographic patterns, and then the target is set at don't drop below 50 percent, then it's just not the case that district lines that are then drawn to bring the district into compliance with one person, one vote, are necessarily going to be based predominantly on race rather than traditional districting principles. And if a racial target was alone sufficient to trigger strict scrutiny, it would deprive the States of the flexibility that they need to comply with the Voting Rights Act. Roberts So maybe I missed your question. You're saying if it was 75 and it's down to 50, that does not necessarily mean it would be? No, I did not say that. I said if the target was that it shouldn't go below 50, not that the target was it had to get to 50. Okay. So it's at 75, and they say what we're going to do when we draw this is not get below 50. Right. And so they could end up anywhere between 70 and 50. So it's just they could end up right at 70, or at 65, or at 60, or at wherever there is in between. So it's just not necessarily the case that the use of a target may have had little or nothing to do to a target that that's so low at 50 percent when you started up here at 75, then most of the lines that you're drawing are probably likely to be drawn based predominantly on traditional districting factors. It's just not necessarily the case that you're going to have to predominantly use race, because no matter what you do, you're going to end up above 50 percent. Are those the only kind of districts where you would say that a target would not have an impact on district lines? In other words, where the district has a population that's so far above the target that nothing that they're doing on the margins is affected by the target, are those the only kind? No, I would not say that. Because I would say districts, for example, like in this case where you start at 60, there's no reason necessarily to think that race is going to predominate in order to bring the districts into compliance with the Voting Rights Act. They started out at 60, and let's assume based on traditional redistricting factors and not on race, there's no reason that it couldn't end up on at 60 for the same reasons. Alito, what if you started at 53 and you brought it up to 55? Again, I'm with you on there. It doesn't necessarily you would need more evidence than that. Now, the one that raises the biggest question. More evidence of what? That. Well, so the most important evidence, Justice Alito, would be a conflict with traditional redistricting principles. And if you could establish that and that it went up to that degree and it affected a substantial number of voters, then I think you could make out a case. Alito, what if they said, well, we're at 53, we have a 55 percent floor, we want to bring this up to 55, and we can do that by drawing a district that's even more compact than the district that we had before? So ordinarily speaking, it's going to be very difficult to show that race predominated without showing a conflict with traditional redistricting principles, but there's no hard and fast rule that says that prevents a plaintiff from trying. Kagan. When can you? What would be a case in which that might be possible? Not just theoretically possible, but you can imagine it happening. So I we have two examples in our brief, and most of the cases I can think of are variations of those. So the first relies on direct evidence from the mapmaker himself, and the second is where the State's nonracial explanation is discredited by the evidence. So if you have 10s of thousands of predominantly white voters moved out, 10s of thousands of predominantly minority voters moved in, and the mapmaker says, I did that to hit the target, then a finding of racial predominance could be made, even if, Justice Alito, the district was reasonably compact. And the second example that I would, from the brief, is that the State says politics is what explains that. And then you look at the evidence, and they used racial data rather than political data, then a finding of racial predominance could be made, even if politics is also playing a role, and there's no conflict with politics in the drawing of the district lines. Maybe there's no way around this, but this is all, as you lay it out, very, very complicated. And the State legislature has to redistrict a huge, a large number of districts in a short amount of time using a very, a multi-factor, vague predominance standard. And if it turns out that there is predominance, when they will be deemed to have had a strong basis in evidence that there would be a Voting Rights Act claim is also quite unclear. So it's just, maybe there's no way around it, but isn't this just an invitation for litigation in every one of these instances? So we're very sympathetic to the interests of the State in being able to comply with the Voting Rights Act while simultaneously pursuing its traditional redistricting policies. And in fact, we proposed a version of the conflict case test to the court in Miller. But we read Miller and Shaw to have rejected this conflict requirement, and instead to replace it to what, as you said, is a complicated test about whether race predominated in the drawing of district lines, even if traditional factors also played a role. Roberts Is it still the office's position that it would be preferable to have the test that was adopted by the district court here requiring a conflict before you find that race predominated? So putting aside the question of whether it would, you would, overruling the court's decisions, yes, except that we wouldn't want that to bleed over into racial vote dilution claims. Roberts So your objection to the court below is that it required the conflict. Miller Correct. Roberts And in your brief, you say in the vast majority, in your words, of cases you will need to show a conflict. Miller Correct. Roberts And you think showing a conflict should be the correct legal standard, putting aside the decision. Miller Well, I wouldn't want to urge the court to overrule its decisions. I'm not sure there's a basis for that. Roberts No, no, putting those decisions aside, that is the position we advocated in or a version of it in Miller. But in the Alabama case, certainly what I tried to do, changing what my position had been previously in order to get a court that would have a clear set of standards, on page 1271 there are two paragraphs that address the issue you're talking about and virtually say what you say. And then at the end, to deal with the problem you're raising, we say that it has to be a strong basis in evidence. That's because you don't want to put the district court in a position and the legislature to do the impossible. All right? So it tries to do that. That is the decision of the court. I had thought that having done that, there would be lots of lower courts that would rely on that decision. Is it a good idea now suddenly to change and go to some different test? Miller No, I'm not saying you should go to a different test. I think the stare decisis considerations are what they are. The court's Alabama approach is the right approach. But under that approach, Justice Breyer, you did not say that it's essential to show a conflict with the position. Breyer Yes, correct, exactly. It's predominant, and then it has the two paragraphs I've talked about which are meant to illustrate what that predominance means. And they're pretty much what, I think, pretty much what you said. Miller Yes. We would agree with that. Sotomayor What is it that you said? Miller I think that what we said are two things. One, that simply because you use a racial target, you're not in strict scrutiny, and that's from Alabama. And two, a conflict is not essential to proof of claim. But three, there has to be some pretty strong evidence besides just the use of the racial target to put you in strict scrutiny.  Kagan If we did vacate this on the grounds that that's the correct standard, what you just said, and that is not the standard that the district court used, what do you think would happen? You know, if the standard that you just stated was fairly applied, would anything change? Miller So we have only done a close analysis of three districts, as you can see from our brief. And in two of those three districts, we thought there was a pretty strong case, but not one where we could say it definitely would come out one way or the other. Kagan But a strong case that it would change? Miller It would change. Kagan And those districts are? Miller Those are 71 and 95. Roberts Thank you, counsel. Mr. Clement. Clement Mr. Chief Justice, and may it please the Court, the 2011 redistricting of the Virginia House of Delegates was a bipartisan success story. There was wide agreement that the 12 majority-minority districts that existed in the benchmark plan should be preserved. And there was a consensus on the Bipartisan Privileges and Elections Committee that a 55 percent BVAP level was the appropriate level to ensure that African-American candidates in those 12 districts had an opportunity to elect the candidates of their choice. Ginsburg How was the 55 percent arrived at? Clement 55 percent, the testimony in the record, Justice Ginsburg, shows that that was arrived at by the members of the Bipartisan Privileges and Elections Committee. It was principally done by the principal architect of the plan, Delegate Chris Jones, by talking to members of the public and members of particularly the African-American Caucus. And they told Delegate Jones, and then they reinforced this on the floor. And the floor debates in the House of Delegates are something that's on the CD in the Joint Appendix, and it is worth a look, because the African-American members of the House of Delegates testified that based on their knowledge of their districts that African-American voters did not vote in the same numbers as white voters, therefore, to simply have 50 percent would lead to the BVAP level. Kagan I thought, Mr. Clement, that the 55 percent was based on a single district, 75, and that they said, okay, we've looked at 75, you need 55 percent there, and then it was applied across the board to every other majority-minority district without any granular analysis. Clement I don't think the record would support that characterization of the evidence, Justice Kagan. I think it was certainly based predominantly on HD-75, but it was also based on the She testified as well that it has to be north of 50 percent. It was also done in consultation with Delegate Spruill, who's the delegate from District 77, and it was based on not just the demographics in HD-75, though that was essentially the starting point, but also based on the characterizations of the districts and the voting tendencies. Kagan So isn't there something a bit strange about this kind of rule? And it's not to say that this kind of rule is the end-all and be-all. It might be that you can have this rule and still be absolutely fine in the way that Mr. Gorenstein suggested, but the idea that you would look at 12 districts and say that every single one of them ought to meet the same BVAP standard without looking at the characteristics of those districts, who's in them, how they vote, I mean, it sort of defies belief that you could pick a number and say that applies with respect to every majority-minority district. Well, Justice Kagan, I think that maybe if you were picking one number for every district in the State from Big Stone Gap to Arlington, maybe that would be the case. And if you were trying to apply one number to Latino districts in one part of the State and African-American districts in another part of the State, you might have a point. But although these are 12 districts and there are four subregions, these are all pretty much in the same part of the State. They all started on a benchmark map as somewhere between 46 and about 62 percent for starting, so it's not like this number comes out of thin air. With respect to 9 of the 12 districts, they're already north of 55 percent and between like 55 and 62. Two of the other ones are very close. They're at like 54 and 53. And then one is a little bit lower, at like 46, which is District 71, which I hope I'll get a chance to talk about, because there there's very strong evidence that the redrawing was not done solely on the basis of race. Breyer, let's talk about 71. Now, I have a particular question on 71. Remember what I was trying to do, at least in Alabama. The Court's cases at that moment, pre-Alabama, I'm one of the problems, okay? So I am trying to reflect what is actually there in Miller, for better or for worse, and to make it clear. The column I've referred to talks really about evidence showing predominance, does it or doesn't it. And there are two things there that are crucial in that, I think, in those two paragraphs. One, there was direct evidence that they moved 70,000 or 50,000, 15,000 people, they were all black, okay? Two, when you look at the three districting traditional criteria, they are pretty weak as applicable to that case. They just seem not to have much relevance to what they are talking about. Now, let's look at 71. Same kind of thing they are arguing. Same kind of thing. They moved, I don't know, you have it in the SG's brief, too. They moved 11,293 people out and 17,000 in. So let's look at those people. The ones they moved out were three-quarters or something white, and the ones they moved in were three-quarters or something black. So that's pretty similar. It seems to me they paid a lot of attention to race. Then they say, let's look at the traditional criteria. The one they mentioned, which is this horn thing, they said that they did it to keep it preserved Richmond-centered, but it already changed it, so it wasn't Richmond-centered at all. And their changes had nothing to do with it. So what they are saying is, in that case, look at that specificity, and you will see that the mistake of the judge enlisting the criteria, you know, his statement overly broad or whatever, made a difference, send it back, get him to do it right. Now, that's a long question, but that's designed to focus you. And I'm glad to be focused on District 71, because what the district court did is not apply any sort of cartoonish analysis. He looked at the district as drawn. The first thing he noticed is that it preserves 78 percent of the core of the district, which is higher than the statewide average of 70 percent. So you have the core of the district is being preserved, which is a traditional districting principle. He then looks at those horns, and he looks at them, and he doesn't just look at them and say, well, they look a little funny. He has direct testimony from Delegate Jones, who drew the district, and he realizes that the horns were drawn in order to preserve an incumbent in the neighboring district so that that incumbent could stay in her district. He then looks at Precinct 207, where he says he doesn't want to get into conflicting testimony between two delegates, and what he says, I think, absolutely correctly, is this is a contiguous precinct. It's 207. It's right on the border. So whether it's in or out, it conforms with traditional districting principles. Kennedy, I suppose you have two districts, or two possible districts. Each of them look conventional. Each of them are conventional in the same sense that you've been describing these multiple factors. But the stated reason, the stipulated reason for choosing District A over District B is because it has more voters of a certain race, black, Latino, white, whatever. Is that a predominant motive based on race? I would say that the right answer to that for predominance within the meaning of your Court's cases is no. And I think there are two reasons. Kennedy, that's what the district court said, and I have a problem with that, because predominance is designed to measure intent when there are multiple causes. And in my hypothetical, the hypothetical is the tipping point, the principal motivating factor was race. And you say that because the district court, I think, said because the districts are conventional in all other respects, strict scrutiny doesn't apply. I have a problem with that. Okay. Justice Kennedy, I thought you might, but I'd like to say three things to try to convince you in defense of the district court. First of all, I mean, when this Court says predominance, I assume they mean predominant over something else. And I think the something else is traditional districting principles. So when race predominates over those principles, those principles are sacrificed. They're subordinated. I think that's the way to make sense of this Court's cases. Second of all, I think that if you apply the test that way, what you are doing is you are mapping on the test to the theory of a Shaw claim. Now, you may disagree with me on this, but I think what makes a Shaw claim a Shaw distinctly formed district in a community of interest based on race, it's the particular injury in a Shaw claim, is that people from different parts of the State who would share nothing in common except the color of their skin are grouped together in the same district. That's what makes a Shaw claim different from other kinds of claims. And I completely agree with the Solicitor General's office that in thinking about this question, you should be thinking about Shaw claims and thinking about them separately from vote dilution claims. And I think there's a real problem in this area of the law, is what's happened is that Shaw, which started as a doctrine for outlying districts and outlying claims, has become the weapon of choice in redistricting litigation, and people see Shaw violations everywhere. And that's just not the way that Shaw was originally constructed. It ignores that there is a separate vote dilution claim that can be brought that has a much higher standard of proof, and people are essentially trying to evade that by bringing junior varsity --" I'm sorry. Kagan No, please. People are bringing junior varsity dilution claims under the guise of calling them Shaw claims, and I think it's really distorted the law. The third point, just to put it on the table, is that at some point, then, you have to ask the question, is if you disagree with me on those first two points and you actually think you have a different conception of what a Shaw claim is, there still has to be the question of, is the game worth the candle, given the stated need to defer to State legislatures? And 80 members of the House of Delegates voted in favor of this plan because they --" it comforted with traditional districting principles, and everybody wanted to preserve majority-minority districts. I'm sorry, Justice Kagan. Kagan No. Just going back to Justice Kennedy's question, it seems pretty clear to me that in the cases after Shaw, because Shaw, you could have looked at it as this is all about the way the district looks. And then in the cases after Shaw, in Shaw II and in Miller, the Court makes very clear that it's not all about the way the district looks. And indeed, it's the same. Clement Can I stop you there, though, and say, I mean, in Miller, what this Court confronted was an argument that bizarreness is an element of the claim. And I think, you know, and nobody, I think, thinks that's the right answer. Kagan If you look at Shaw and Shaw II, and you look at Miller, and then you think about the hypothetical that Justice Kennedy gave you, which is essentially, maybe I'll change it a little bit, it's essentially a mapmaker who says, look, we really want to do race-based districting here. We can manage to do this in a way where the maps look kind of contiguous and kind of regularly shaped, but what we're doing is race-based decision-making. Now, it seems pretty clear to me that if you look at Shaw II, if you look at Miller, that's forbidden. And that's exactly the opposite of what the district court said here. Clement I don't think that you have to read those decisions in that way. I think if you're going to read those decisions in that way, it's appropriate to pause and reflect where it's gotten us. And I think that every one of those decisions starts out by saying, this is a very difficult task for State legislatures. It's hard enough to draw districts without the Voting Rights Act, but to draw them in compliance with the Voting Rights Act is exquisitely difficult, and we want to have deference to State legislatures. Kagan Well, then I'm with Justice Breyer, who suggested that a few years ago, we took those concerns into account, and we tried to figure out a test that was responsive to those concerns, and that is not the test that the district court used here. I beg to differ. I think you have to, as Justice Breyer was suggesting, at least in the first 25 minutes, give the district court a little more credit than that. The district court had Alabama in front of him. He also had the arguments of the parties. And I think if you go back and look, I mean, with all due respect to my friends on the other side, they did not argue this in terms of let's look at all the people moving in and out. That was not the thrust of their case. They really argued that this was a direct evidence case based on the fact that the  Breyer Well, that's what I have to do after this argument, isn't it? I mean, you gave me exactly what I needed. You gave me the things to look up. He gave me the things on the other side. And they didn't use exactly the right test, but does it matter? And I think the reason I approach it that way is because this is such a concern the reasons you said, okay? You have to give leeway here, leeway, leeway. But the government makes a pretty good point here that they really was important evidence he didn't look at. And that's my job, isn't it, to go back and read these things and figure out how they, the evidence there. Clements Absolutely. But I think you should look at the evidence in this case. And you shouldn't look at the evidence that could have been mounted. You should look at the evidence as it actually came in, the way it was argued to the district court. I think if you go and look, for example, at the closing arguments of this case, you will see that the other side did not say, this is a case about moving too many people in and out of a particular district. They said, this is a direct evidence case. They told you what the problem was. They told you they were going to apply a 55% BVAP floor. And that, and so really, they tried to get not just some tailwind from the fact that there was a BVAP floor. They tried to make, essentially, rest their case below on that proposition. And as a result of that, it left them with a vacuum in the evidence, because we have extraordinarily good evidence on our side of this case, because the principal map drawer, Delegate Jones, testified for hours and hours about why particular lines were drawn. And in every case, he provided explanations for why they comported with traditional principles. But not just that. He told you why the lines were there. The lines weren't there because, oh, we had this 55% BVAP target and everything had to go out the window. He said, well, you know, down here in South Hampton Roads, we have three incumbents that are all close together because this part of the state lost a lot of population. So I drew some zigs and zags here to keep the three incumbents separate, which I think is a perfectly non-racial explanation for it. Now, down in District 77, that looks a little funny, but I got together with Delegate Spruill, and Delegate Spruill said he wanted to reunite the old city of South Norfolk. So we did that. And that required us to move a couple of districts around, and there it is. There's reams of evidence of that. And there's really a vacuum of evidence on the other side of this. And I do want to sort of rewind the tape a little bit to here, which is the reason it's so problematic, I think, to think that just because they applied a BVAP floor, you're like already three-fourths of the way to applying strict scrutiny, is, I mean, what else is a state legislature supposed to do? I don't think in this context a BVAP floor is inherently sinister. And, I mean, one way of thinking about this, Justice Kagan, is the Voting Rights Act itself is a BVAP floor. I mean, in those situations where it requires a majority-minority district, that's a quantitative floor of at least 50 plus .01 percent. But everywhere, it's a qualitative floor that you have to preserve the ability to elect. And so there's nothing in this context, and I think that's exactly why this Court has gotten where it's gotten, and I'm not so sure that you couldn't even further refine what you said in Alabama to make it a little bit closer to where I think the law should be in this area. But here's the point. I mean, the reason that in this area uniquely the Court allows race to be considered is in part because the Voting Rights Act makes the consideration of race absolutely necessary. And I don't want to think you want to send the signal — I mean, unless you want us to take the first steps towards declaring the Voting Rights Act unconstitutional — you don't want to send the signal that when legislatures approach this in a way that I think is perfectly appropriate to what's going on. I mean, Virginia's got 12 years — Kagan. You absolutely don't, Mr. Clement, but it's one thing for a legislature to say we view it as a core priority up there with one person, one vote, to comply with the Voting Rights Act. That's a terrific thing. It's another thing for the legislature to do what it did, for example, in the Alabama case, which is to just say something about there can't be any retrogression from whatever there is, notwithstanding that that's just not Section 5 law. And similarly, it's another thing for the legislature to just pick a number out of one district, apply it to all 12 districts, and say that that's compliance with the Voting Rights Act. Now, I agree with you and with Mr. Elias and with Mr. Gorenstein. That does not get you all the way there. But there's something about — this is — Alabama suggested this was evidence when — when a State says across the board we're going to do something that just on its face you know is not required by the Voting Rights Act, that's a problem. Well, with a lot of what you had to say, Justice Kagan, I think where I'm not with you is that there is something particularly problematic about picking a 55 percent number and applying it in — in Richmond and south and in the Hampton Roads area. And I think — I mean, I'd say two things about that. I mean, in the universe of possible numbers, 55 percent is about the best number you could come up with, because if — I mean, my friends on the other side agree these all need to be majority-minority districts. So if the whole debate is it's got to be somewhere north of 50 percent, I mean, 55 percent, which gives you a little bit of margin for the fact that there may be differentials in — in — in — in turnout and where the rubber is going to meet the road, remember, is on the cases where — I mean, you know, the incumbents are going to always win, and most of these districts are majority-minority, but they're way majority Democrat. So where the rubber is going to meet the road about opportunity to elect is going to be in the open primaries. That's when you're really going to tell whether the African-American has — community has the opportunity to elect the candidate of their choice. Now, those are relatively rare. And so the idea that, you know, it's — it's somehow presumptively unconstitutional for the State to look at one of the most recent open primaries in HD 75 and say, well, you have five percentage points, but five percentage points in a badly splintered primary. It's only 300 votes, and Delegate Tyler herself is saying, you know, these need to be north of 50 percent. Everybody's basically saying that. You know, I don't think it's fair to put this — and I guess this is where I'd really take issue — I don't think it's — I think it's a mistake to put this in the same basket as Alabama. The idea that you can't go from 80 to 79 percent is a cartoonish version of the Voting Rights Act. To say that in an area where nine of the 12 districts are already north of 55 percent, to say that 55 percent is a pretty darn good threshold for compliance with the Voting Rights Act just isn't in the same category at all. And I know they try to get a lot of sort of mileage out of the idea, well, it was one-size-fits-all. But the two things I would say about that, one I've sort of already said, which is we're talking about the same part of the State. And there's no reason to think there's a different dynamic in this. And all of these districts are majority, minority districts, African-American districts. It's not like they're applying one rule and trying to say that it fits, you know, for the — for the complicated districts in northern Virginia with multiracial groups and those districts down in the south. They're all very similar districts. That's one thing. The second thing is, I mean, keep in mind, whatever rule you adopt here is not just for relatively sophisticated State legislatures. It's going to apply to all sorts of school boards and sewer districts. So there has to be — I mean, I just don't think the analysis is that you have to go district by district with regression analysis in order to comply with the Voting Rights Act. I don't think that's the rule you want to lay down. And I also think, and this is, I think, responsive to Justice Kennedy's earlier question, I mean, the idea that they have on the other side is they're not against racial targets. They agree these need to be majority, minority districts. Here they agree they need to be north of 50 percent. Their real beef is with the legislature making a sort of common-sense judgment based on the evidence in front of them that it should be 55 percent. What they want is more use of race in more minute detail, where you go district by district and say, all right, as to 75, it's going to be 55, as to 63, it's going to be 74, as to 77, it's going to be 56. I don't think that gets us further along the lines of compliance with the Equal Protection Clause. I also don't even think it's practically possible. Kagan. I think that that the real difference between your standard and the SG's standard is that in your standard, the shape of a district functions as a threshold inquiry such that if the shape is okay, we don't look at anything else, and particularly we don't look even if the districting was completely race-based in motive. And that's just what the that three-part test does. It sets up a threshold inquiry about how the district is shaped in a way that some people thought sure was when sure was first announced, and that this Court in one, two, three subsequent cases made clear it wasn't. Well, Justice Kagan, first of all, I think the real difference between our position and the SG's position is a difference in the real world, which is they admit it's not going to make a difference in 99% of the cases. All right, maybe they had something else in mind by vast majority. But in a lot of these cases, it won't make any difference. But given the stakes, it's going to mean that lots more state legislatures get sued over districts that don't even look particularly suspicious. And this case is the perfect example. These districts existed for four years and two complete election cycles before anybody perceived there was a racial gerrymander lurking here. And what changed in 2014 was the resident of the governor's mansion in Richmond. And what happened is these guys realized that if we can get these districts thrown out and they have to redraw the district, we'll now have a veto power that we didn't have before. That explains why lines that look perfectly square relatively and were approved 80 to like nine with a majority of Democrats supporting them, all but two members of the African-American caucus supporting them, with one of the two members of that caucus opposing them because the numbers weren't high enough. I mean, that's the dynamic that was 2011. You go from a bipartisan success story where everybody points to the House and says these guys did it right. The Senate, not so much. The House, these guys did it exactly right. They did everything that they were supposed to do. Four years later, they can still draw a racial gerrymandering charge and have to litigate for years based on this theoretical possibility that maybe, just maybe, in drawing these square lines, somebody took race. Kagan Well, more than a theoretical possibility, I mean, Mr. Gorenstein says, and he seems to be pretty sensitive to the idea of giving States latitude, but he looks at this and says this standard actually did make a difference on the ground, that there were districts that were kicked out and said, oh, this isn't race-based because it looks good. Even though it was race-based. Clement Well, I would put, representing the State legislature of Virginia, my bona fides in looking out for the States, even ahead of Mr. Gorenstein's. And it's easy in the Solicitor General's office to throw out a standard that's theoretically pure and it's going to force lots of other people to litigate for years. These districts were good enough for everybody for four years. They were good enough to be pre-cleared by the Justice Department. Having this detailed inquiry out there to have them invalidated years later does not seem to me to have a lot to recommend it. Thank you, Your Honors. Roberts Thank you, counsel. Mr. Elias, you have two minutes left. Elias Mr. Chief Justice, may it please the Court, I want to clarify a few factual points and obviously answer any questions you have. The first is the timing of this case followed the Page decision. It was the Page III court that ruled on the congressional map that then was the --" That case was filed when there was a Republican in the governor's mansion. It had nothing to do with who was in the governor's mansion, just as a factual matter. Justice Breyer, to your question that you posed to me earlier and which is at the heart of this, we completely agree with the analysis in Alabama that there needs to be a --" that you need to show voters moved in and out on account of this rule. And if you look at JA 672, you will see there is a 50.8 percent differential between the white voters moved out and the black voters moved in. As you point out, three-quarters of the voters moved in were black. And the other one was black. Breyer Did you make a point of that? Elias Yes. Breyer I mean, I think I heard Mr. Clement say that. Well, no, this is all being brought up after the case was over and --" Elias Your Honor, it's in our experts' report from trial. It's just not true. You can find it in the JA because it was --"  You called it to the attention of the judge. Elias We called it. It was in our experts' report at trial, point number one. Point number two, very quickly, this Court in Shaw v. Hunt specifically dealt with Justice Stevens's dissent, saying there should be an actual conflict test. And what this Court said is, in his dissent, Justice Stevens argues that strict scrutiny does not apply where a State respects or complies with traditional districting principles. That, however, is not the standard announced and applied in Miller. Shaw too resolved for this three-judge court well before Alabama that an actual conflict test was not the law. And the district court here simply ignored it. Roberts The case is submitted.